**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

LORI ANN BROWN,

                    Plaintiff,

          v.

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                    Defendant.

Case No.  1:14-cv-01288-DAD-SKO

**FINDINGS AND RECOMMENDATION THAT PLAINTIFF'S APPEAL FROM THE ADMINISTRATIVE DECISION OF THE COMMISSIONER OF SOCIAL SECURITY BE DENIED**

**Objections Due: 14 Days**

(Doc. 19)

## I.   INTRODUCTION

Plaintiff, Lori Ann Brown ("Plaintiff"), seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits pursuant to Titles II and XVI of the Social Security Act.  42 U.S.C. §§ 405(g); 1381-83.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge, for findings and recommendation to the District Court.

## II.   FACTUAL BACKGROUND

Plaintiff was born on November 24, 1965, and alleges disability beginning on January 1, 2009.  (Administrative Record ("AR") 26; 150; 172-82; 204; 248.)  Plaintiff's date last insured was September 30, 2011.  (AR 172; 204; 248.)  Plaintiff claims she is disabled due to hearing loss, anxiety and panic disorders, migraine headaches, high blood pressure, and muscle spasms.  (*See* AR 19; 176.)

**A.   Relevant Medical Evidence**

**1.   Alexis M. Valos, Ph.D.**

On June 3, 2011, Dr. Alexis M. Valos, Ph.D., performed a psychological evaluation on Plaintiff at the request of the state agency.  (AR 262-66.)  Plaintiff complained she had lost everything after her husband's death, and described ongoing symptoms of anxiety, irritability, aggression, and migraines.  (AR 262.)

Plaintiff reported feeling easily irritated, snapping at people, driving aggressively, a racing heart, feeling overwhelmed, suffering from panic attacks three times a week, a tightened chest, migraine headaches with blackouts, and feeling like she could not catch her breath.  (AR 262.)  Plaintiff stated her migraine headaches and anxiety began during puberty, and her hearing loss began in 1996.  (AR 262.)  Despite feeling "isolated" from others and narrating a history of childhood sexual abuse and being "on her own since age 12," Plaintiff reported speaking with friends daily and "get[ting] along" with her family.  (AR 262-63.)  Plaintiff completed 8th grade with mostly C and D grades, and did not graduate, earn a G.E.D., or get any Certificate of Completion of schooling.  (AR 264.)  Plaintiff reported doing all household chores, her own cooking, grocery shopping, and laundry, handling her own money, and independently driving herself.  (AR 264.)

Upon mental status examination, Dr. Valos observed Plaintiff had good hygiene and grooming and a "congenial and engaging" interpersonal style.  (AR 264.)  Despite reporting an anxious mood, Plaintiff displayed a bright affect, good eye contact, and was "very talkative." (AR 264.)  Plaintiff exhibited normal speech, normal and goal directed thought content, and no flight of ideas.  (AR 264.)  Dr. Valos observed Plaintiff's attention and concentration were below

average and her memory appeared to be mildly impaired, but she was able to follow a simple three-step direction without prompting.  (AR 265.)  Plaintiff's fund of knowledge appeared to be "low-average," her abstraction and intelligence appeared to be below average; her insight and judgment, however, were average.  (AR 265.)  Dr. Valos opined the evaluation was "an accurate representation of [Plaintiff]'s current functioning, as she was cooperative and appeared to put forth good effort in answering interview questions."  (AR 265.)

Dr. Valos diagnosed Plaintiff with an anxiety disorder based on her subjective report of symptoms and with a cognitive disorder based on her performance during the psychiatric exam. (AR 265.)  Dr. Valos opined Plaintiff's "daily activities and social functioning appear to be somewhat vulnerable to episodes of deterioration in a work-like situation."  (AR 265.)  Dr. Valos opined Plaintiff's symptoms might interfere with relationships with co-workers, supervisors, and the public in a work-like situation and cause difficulty in tolerating the stresses, pressures, and changes in a routine usually associated with day-to-day work activities.  (AR 265-66.)  Dr. Valos also opined Plaintiff's cognitive impairments rendered her "unable to carry out complex tasks, which require focused attention, concentration, and memory skills" and would likely cause her "difficulty [in] adapting to the changing cognitive demands associated with day-to-day work activities," but that Plaintiff would be able to carry out "various simple tasks."  (AR 266.)

### 2.     Sarupinder Bhangoo, M.D.

On June 26, 2011, Dr. Sarupinder Bhangoo, M.D., performed a comprehensive internal medical evaluation and functional assessment at the request of the state agency.  (AR 268-71.)  Dr. Bhangoo noted Plaintiff complained of hearing loss beginning in 1976 and frequent, debilitating migraine headaches once or twice a week.  (AR 268-69.)  Plaintiff reported that she lived alone, cared for herself, did all the grocery shopping, cared for her two dogs, and drove.  (AR 268.)  Dr. Bhangoo noted Plaintiff came into the examination room without difficulty and moved around the room well, was able to get in and out of the chair and onto the examination table without difficulty, walked with a non-antalgic gait, and was able to tiptoe and heel walk.  (AR 269.)  On examination, Plaintiff had normal cranial nerves II-XII, full motor strength, normal sensation, and was negative for the straight leg raising test.  (AR 270-71.)  Dr. Bhangoo diagnosed Plaintiff with

1  progressive sensorineural deafness and opined that though Plaintiff had a history of right ankle

2  surgery and migraine headaches for many years, she had no complaints of ankle pain and was able

3  to work through her headaches, and therefore "no disability could be assigned" to either condition.

4  (AR 271.)

5        Dr. Bhangoo assessed Plaintiff as being able to stand, sit, and walk eight hours in an eight-

6  hour day, occasionally lift/carry 100 pounds, and frequently lift/carry 50 pounds.  (AR 271.)  Dr.

7  Bhangoo assessed no postural or manipulative restrictions, but noted that Plaintiff "definitely has

8  communicative issues because of hearing loss which at the present time is partial only."

9  (AR 271.)  Dr. Bhangoo concluded that Plaintiff's "maximum functional capacity is rated as

10  heavy with communication limitations."  (AR 271.)

11       **3.**    **Taft Community Medical Center**

12        Between August 2011 and August 2012, Plaintiff was treated at Taft Community Medical

13  Center for generalized anxiety and mixed bilateral hearing loss, and requested a referral for her

14  diagnosed chronic hepatitis C without hepatic coma.  (*See* AR 338-62, 657-767.)  Plaintiff

15  reported on multiple occasions that she "currently takes no medications" (*see* AR 341, 348-50,

16  352, 354, 663, 673, 675, 687, 708) and did not suffer from headaches (*see* AR 338, 341, 348, 350,

17  352, 764).  Upon mental status examination, Plaintiff repeatedly exhibited appropriate judgment,

18  good insight, a euthymic (non-depressed) mood, appropriate affect (AR 338, 341, 348, 350, 352,

19  354), and intact recent and remote memory (AR 341, 350).

20       **4.**    **College Community Services**

21        Between October 2011 and March 2012, Plaintiff received mental health treatment at

22  College Community Services.  (AR 641-56, 768-81, 785-99.)  In the October 2011 initial

23  assessment, Plaintiff reported that she was under a lot of stress.  (AR 651.)  Plaintiff stated that

24  after her husband had passed away two years before, she was forced to close their business, lost

25  their vehicles, and began caring for four family members who were ill and required home health

26  care.  (AR 651.)  Plaintiff stated that she was involved with issues regarding her husband's estate,

27  was in the process of losing their house, and she had recently contracted Hepatitis C.  (AR 651.)

28  //

4

Upon mental status examination, Plaintiff had no hallucinations or delusions and appeared "very well groomed, with make up on, jewelry, hair done." (AR 655.) However, she reported suicidal thoughts/intentions, and her therapist Laurie Stamps, M.F.T., recommended a psychiatric evaluation for medication check, individual therapy, and limited individual rehabilitation. (AR 655.)

On January 26, 2012, Plaintiff was seen by Dr. Ravi Goklaney, M.D., for treatment. (AR 648-50.) Plaintiff complained of symptoms of anxiety, panic attacks, and aggressive behavior, but reported no racing thoughts, paranoid ideations, social withdrawal, crying spells, or suicidal ideation. (AR 649.) Dr. Goklaney observed that Plaintiff maintained good eye contact, was neat and clean, had pressured speech, had a constricted, anxious and blunted affect, exhibited "ok" recent and remote memory, had an average intellect, and demonstrated fair insight and judgment. (AR 649.) Dr. Goklaney diagnosed Plaintiff with major depression, recurrent and severe, generalized anxiety disorder, panic disorder, and post-traumatic stress disorder ("PTSD") and prescribed Remeron, an anti-depressant, and Tegretol, a medication used to treat bipolar disorder. (AR 650.)

On March 2, 2012, Plaintiff returned to Dr. Goklaney for a progress evaluation. (AR 646-47; 790-91.) Dr. Goklaney observed that Plaintiff was neatly groomed, had pressured speech, was cooperative, had an anxious mood and blunted affect, had a disorganized thought process, had impaired attention/concentration, and had fair insight, memory, and judgment. (AR 646; 790.) Dr. Goklaney continued Plaintiff's Remeron prescription, discontinued Tegretol, and prescribed Seroquel. (AR 647.) On December 5, 2012, Dr. Goklaney added a prescription for Buspar, an anti-anxiety medication. (AR 792.)

In June 2012, Ms. Stamps completed a "Physical Residual Functional Capacity Questionnaire" and a "Mental Impairment Questionnaire." (AR 376-78; 380-84.) Ms. Stamps noted Plaintiff had severe bilateral hearing loss, tinnitus, and dizziness but could tolerate low stress jobs. (AR 376-77.) Ms. Stamps opined Plaintiff could sit or stand more than two hours at one time, stand/walk at least six hours in an eight-hour day, lift ten pounds frequently and twenty pounds occasionally, and would not need to take unscheduled breaks during the workday.

1 (AR 377-78.)  Ms. Stamps reported Plaintiff was receiving medication and monthly psychotherapy

2 with a "good response."  (AR 380.)  Ms. Stamps reported clinical findings of "[d]epressed mood,

3 marginal sleep, nightmares, pressured speech, increased psychomotor, anxious, blunted affect,

4 [and] disorganized thought process" and described Plaintiff's diagnosis as "guarded."  (AR 380.)

5          Ms. Stamps opined Plaintiff had no useful ability to function or was unable to meet

6 competitive standards in most work-related mental activities, and she would be likely to miss more

7 than four days of work per month.  (AR 381-84.)  Ms. Stamps noted Plaintiff had "[g]reat

8 difficulty with focus, easily distracted, extremely anxious, prone to angry outbursts with peers

9 which are impulsive in nature, [and] frequent panic attacks" (AR 382) and opined that while

10 Plaintiff "is a very polite, well-groomed individual" she "could decompensate in angry outbursts

11 and display socially inappropriate behavior" (AR 383).  In August 2012, Ms. Stamps completed

12 additional questionnaires regarding Plaintiff's mental capacity where she assessed similar

13 limitations.  (AR 393-401.)

14          **5.      Kern Medical Center**

15          Plaintiff has a well-documented history of bilateral hearing loss.  (AR 543.)  An audiogram

16 showed bilateral mixed hearing loss consistent with bilateral otosclerosis.   (AR 517, 543.)

17 Plaintiff underwent a right stapedectomy, a surgical procedure of the middle ear to improve

18 hearing, in March 2012 and a right revision stapedectomy in July 2012.  (AR 543-47.)  Upon

19 examination in July 2012, Plaintiff had intact cranial nerves.  (AR 511.)  Dr. Richard F. Busch,

20 M.D., diagnosed Plaintiff with severe otosclerosis and prescribed an audiogram bone-anchored

21 hearing aid.  (AR 512.)

22          **6.      State Agency Medical Consultants**

23          On July 11, 2011, state agency psychiatric medical consultant Kwong W. Law, M.D.,

24 completed a mental functional capacity assessment and psychiatric review technique form based

25 upon a review of the medical record.  (AR 274-89; 290-94.)  Dr. Law opined Plaintiff was

26 moderately limited in her abilities to understand and remember detailed instructions, to carry out

27 detailed instructions, to maintain attention and concentration for extended periods, and to interact

28 appropriately with the general public.  (AR 274-75.)  Dr. Law assessed no limitations in any other

area.  (AR 274-75.)  Dr. Law concluded Plaintiff retained the ability to complete a 40-hour work week for simple unskilled work, could handle simple changes and stresses in the work place, could respond to work place hazards, could sustain adequate concentration, persistence, and pace for simple, repetitive tasks, and would do best in "limited public contact" work.  (AR 276.)

Dr. Law assessed Plaintiff as being moderately restricted in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace, and concluded there was insufficient evidence to demonstrate repeated episodes of decompensation, each of extended duration.  (AR 285.)  Dr. Law concluded Plaintiff could perform simple, repetitive tasks, could sustain adequate concentration, persistence and pace to complete a normal workday and workweek, could interact appropriately with co-workers and supervisors, and could respond appropriately to changes in the work setting.  (AR 288.)

On February 21, 2012, state agency psychiatrist Dr. Christal Janssen, Ph.D., reviewed the record and affirmed Dr. Law's assessment of Plaintiff's mental impairments and the limitations imposed by those impairments.  (AR 368-72.)   State agency physician Dr. Lucy Sauer, M.D., reviewed the record and concurred with the initial state agency assessment that Plaintiff's physical impairments were non-severe.  (AR 363-67.)  On July 9, 2012, case analyst John Yim opined Plaintiff is limited to simple, repetitive tasks with limited public contact and restricted from working in concentrated hazardous environments by her impairments, but remains "capable of performing a wide range of unskilled work, using [Medical-Vocational Grid] 204.00 as a framework." (AR 374.)

**7.     Nassef H. Henein, M.D.**

In August 2012, Dr. Nassef H. Henein, M.D., completed a "Physical Residual Functional Capacity Questionnaire."  (AR 410-14.)  Dr. Henein opined Plaintiff could perform moderate stress work, sit about four hours and stand/walk about four hours in an eight-hour day, and lift and carry twenty pounds occasionally.  (AR 411-14.)

**8.     Vibul Tangpraphaphorn, M.D.**

Between October 30, 2007, and October 5, 2011, Dr. Vibul Tangpraphaphorn, M.D., treated Plaintiff for various complaints, noted Plaintiff's complaints of stress and anxiety, and

1   noted Plaintiff was taking stress, anxiety, and migraine medications.  (*See* AR 256-58; 301-06;

2   317-20 (largely undecipherable handwritten notes); AR 295-98; 300 (copies of prescriptions and

3   lab reports).)  On January 7, 2008, a colonoscopy ordered by Dr. Tangpraphaphorn to aid in

4   treating Plaintiff's recurrent diarrhea revealed internal hemorrhoids and microscopic colitis.

5   (AR 321; 323-24.)  In March of 2008, Plaintiff tested positive for C. Difficile toxin in her stool.

6   (AR 334-37.)  A July 8, 2011, laboratory report was "highly reactive" for Hepatitis C IgB

7   antibodies.  (AR 329.)  On October 11, 2011, Dr. Tangpraphaphorn noted Plaintiff had been

8   treated for anxiety since 2004 and referred her to Kern Medical Center mental health for

9   "consultation and treatment for depression." (AR 308.)

10         In August 2012, Dr. Tangpraphaphorn completed a "Headaches Residual Functional

11   Capacity Questionnaire."  (AR 403-08.)  Dr. Tangpraphaphorn noted Plaintiff had migraine

12   headaches one to four times per year, and reported Plaintiff's prognosis as "good" and opined her

13   impairments would not be expected to last for even twelve months.  (AR 406-07.)  Dr.

14   Tangpraphaphorn further opined, however, that when Plaintiff was suffering from a headache, she

15   was precluded from performing even basic work activities and needed a break from the workplace.

16   (AR 406.)  Dr. Tangpraphaphorn concluded Plaintiff was capable of moderate stress work and

17   would be absent once a month due to her impairments.  (AR 407.)

18   **B.      Written Testimony**

19         **1.      Plaintiff's Adult Disability Form**

20         On April 26, 2011, Plaintiff completed an adult function report form, noting that she lives

21   alone and on an average day, she will

22   23   24
> . . . Have my coffee, watch the morning news, water & feed my dogs, take trash
> out, check the mail at home & P.O. Box, shower, vacu[u]m, sweep, mop, dust as
> needed, make myself some lunch[,] [p]repare a home cooked meal about once a
> week [and] other times frozen meals.  Go shopping when needed.

25   (AR 195; 196-97.)  She cares for her pets, feeding them and giving them water, and taking them to

26   the veterinarian's office or groomer's as needed.  (AR 196.)  Plaintiff is able to clean for about two

27   hours at a time, do laundry for about an hour and a half at a time, and take out the trash for about

28   ten minutes at a time, as needed.  (AR 197.)

Plaintiff does not do yard work "due to a[n] accident where my foot was cut off due to a[n] electric lawnmower" and, though it was reattached and she does not currently have any lasting problems as a result of the incident, she now has "fears of lawn equipment." (AR 198.)  She has difficulty sleeping due to nightmares and insomnia (AR 196) and relies on a preset phone alarm to remind her to take her medication three times a day (AR 197).  She is able to drive and ride in a car, and goes shopping twice a month for an hour at a time.  (AR 198.)  Though she watches television every day, she is unable to hear unless she "sit[s] as close as possible . . . with [the television] volume on highest volume."  (AR 199.)

Plaintiff does not socialize much because it is difficult for her to hear or carry on conversations.  (AR 199-200.)  Plaintiff "get[s] along fine" with authority figures.  (AR 201.) Plaintiff notes that she has difficulties with hearing, concentration, and following instructions, though her problems with concentration and following instruction arise largely from her hearing impairment as she is able to follow written instructions with "no issue."  (AR 200.)  Plaintiff also states that she has no issue with walking.  (AR 200.)

### 2.     Plaintiff's Work History Report

On April 26, 2011, Plaintiff completed a work history report listing her prior occupations and requirements for performing those occupations.  (AR 183-94.)  Plaintiff previously worked as a member of her husband's drilling consulting business, cashier, waitress, and bartender. (AR 183-94.)  It is unclear whether Plaintiff actually had any duties as a part of her husband's business, as she explains that she was a "stay home wife" at the same time she was listed as a member of the "LLC part[n]ership" and was "never pa[i]d a check." (AR 184; 194.)  As a cashier, Plaintiff walked or stood eight hours a day, and wrote, typed, or handled small objects eight hours a day.  (AR 185.)  As a waitress, Plaintiff walked or stood six hours a day, wrote, typed, or handled small objects six hours a day, and carried trays of food or drinks "from kitchen to tables" six hours a day.  (AR 186; 187; 190; 191; 192.)  As a bartender, Plaintiff walked or stood six to eight hours a day, reached, wrote, typed, or handled small objects six to eight hours a day, and "lifted a case of bottle beer from fridge to cooler – 100 ft."  (AR 188; 189.)

//

### 3.      Third Party Adult Function Report

On January 4, 2012, Plaintiff's friend Vickie Keene completed a third-party adult function report stating she had known Plaintiff for thirty years and spent 3-4 days a week with her "before [she] moved." (AR 220-29.) Ms. Keene's report was largely redundant of Plaintiff's own report, differing only in that she stated Plaintiff could not do yard work due to depression (AR 224) and reporting an assortment of problems with walking, stair climbing, understanding, seeing, memory, hearing, concentration, walking, talking, completing tasks, and getting along with others (AR 226; 227 (Plaintiff suffers due to a "bad an[k]le, can't hear, forget thing[s,] la[ck] of con[cen]trating, min[i]mum walking, Bad, BAD, ANTI SOCIAL").) Ms. Keene reports Plaintiff can only walk 15 minutes before needing to stop and rest and can only pay attention for 15 minutes at a time, does not follow written instructions, does not follow spoken instructions well, gets along with authority figures "ok," and has been fired or laid off from a job "for not[ ] [get]ting along with cust[o]mer or co-workers." (AR 227.)

## C.     Hearing Testimony

### 1.      Plaintiff's Testimony

On November 27, 2012, Plaintiff testified at a hearing before an administrative law judge ("ALJ") by video teleconference and was represented by counsel. (AR 64-85.) Plaintiff testified that her depression was "pretty severe . . . to the point where I have days I can't even get up or I don't want to deal with anything." (AR 65.) Plaintiff further testified that

> . . . I suffer from migraines too on top of [the depression], which is also caused from the stress disorder. At times, it's just so bad where I'm fatigued all the time. I have diarrhea all the time. I have heart palpitations. I suffer from anxiety as well. I lash out at people. I can become explosive and combative at times. I live alone with my two little dogs and I don't really go out much, unless I'm going, you know, to get food or go to the doctors or whatever, so I'm pretty much confined to my home.

> . . . I've had difficulties with my hearing since like '96 and it progressed over the years and it's gotten worse. I've had two ear surgeries already this year where they went in and removed the bones out of my ears and put in pastiches and that didn't work, so they went in and did another surgery, took those out, put in another set of pastiches that's deeper set into the inner ear canal. I still haven't got my hearing back, so now they've put in for a bone aid drain device, but the original doctor who did my surgeries doesn't do that kind of surgery, so they tried

10

> to have another doctor do it, but I don't think the insurance company was going to cover it[.] . . . due to the hearing loss, it's very difficult for me to go in places or take care of anything unless I have somebody there with me that can basically be my second pair of ears. I'll have them repeat what I didn't get or understand.
>
> . . . I don't go out. I don't socialize in public or with people, because it all sounds like all the voices – I can tell they're talking, because I see the lips move, but it all sounds like a muffle. Everything sounds muffled like it's in a tin can or something.

(AR 66-67.) Plaintiff complained of migraines lasting up to five and a half days, with "one or two severe ones every month [lasting] three to five days" where the pain is so intense she "can't even lift [her] head off the pillow" and she is "sensitive to light, sensitive to heat, noises, you know, stress, anything." (AR 68.) She has been hospitalized twice for migraines. (AR 69.) She experiences recurrent diarrhea, stomach pain, and fatigue due to hepatitis C. (AR 69.) Plaintiff reported medication side effects of fatigue, drowsiness, dizziness, tiredness, and dry mouth. (AR 69.) Plaintiff completed eighth grade, but "flunked it." (AR 69.)

### 2. Vocational Expert's Testimony

The vocational expert ("VE") testified at the hearing that Plaintiff had prior relevant work experience as a retail cashier, Dictionary of Occupational Titles ("DOT") 211.462-014, semiskilled light work with an SVP[1] level of 3; as a waitress, DOT 311.477-018, light work with an SVP of 3; and as a bartender, DOT 312.474-010, light work with an SVP level of 3. (AR 80.)

The ALJ asked the VE whether a person of Plaintiff's age, education, and experience, "who can sit up to six out of eight, stand and walk up to six out of eight, lift ten frequently, 20 occasionally, no work from heights or around hazardous equipment. Occasional for postural, no manipulative or reaching limitations. No work requiring fine speech discrimination, such as telephone work. Work should be in quiet environments, such as office settings. No more than superficial public interaction. Simple repetitive tasks" would be able to perform any of Plaintiff's prior relevant work. (AR 82.) The VE testified that such a person could not perform any of Plaintiff's past work, but could perform other representative occupations including as a quality

---

[1]  Specific Vocational Preparation ("SVP"), as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

1   control clerk, DOT 229.587-018, light work with an SVP level of 3, as a document preparer, DOT

2   249.587-018, sedentary work with an SVP level of 2, lab clerk, DOT 222.587-026, light work with

3   an SVP level of 3, and as a credit card clerk, sedentary work with an SVP level of 3, which would

4   be subject to some erosion "because of the issues of communication with the public."  (AR 82-84.)

5          The ALJ posed a second hypothetical, with the additional restriction that the hypothetical

6   individual would miss one day of work per month.  (AR 84.)  The VE testified that "maybe half of

7   the employers would tolerate a continuing absence of a day a month[,]" however, "[i]f it is two

8   days a month, then [the VE testified] that's beyond acceptability in any business or industry."

9   (AR 84.)

10         The ALJ posed a third hypothetical, with the same restrictions as the first hypothetical and

11  the additional restriction that the hypothetical individual would suffer a "20 percent deficit in

12  concentration, persistence, and pace."  (AR 84.)  The VE testified that such a restriction would

13  "result in unemployability" because "[i]t's outside the balance of what any employer would

14  anticipate on a production basis."  (AR 84.)

15  **D.      Administrative Proceedings**

16         On December 20, 2012, the ALJ issued his decision finding Plaintiff not disabled.

17  (AR 17-26.)  The ALJ found Plaintiff had severe impairments of bilateral hearing loss, affective

18  disorder, and migraines.  (AR 17.)  The ALJ evaluated Plaintiff's diagnosis of hepatitis C, but

19  concluded after reviewing the medical evidence that this medically determinable impairment had

20  not been established as "severe."  (AR 17.)  The ALJ then determined that Plaintiff's impairments,

21  singly and in combination, did not meet or equal a listed impairment.  (AR 20.)  The ALJ found

22  Plaintiff retained the residual functional capacity ("RFC") to perform "light work as defined in

23  20 C.F.R. §§ 404.1567(b) and 416.967(b), except she can occasionally perform postural activities;

24  cannot work from heights or around hazardous equipment; cannot perform work requiring fine

25  speech discrimination, such as telephone work; should work in quiet environments, such as office

26  settings; and is limited to no more than superficial public interaction and simple repetitive tasks."

27  (AR 21.)

28  //

Given this RFC, the ALJ found Plaintiff was incapable of performing any of her past relevant work, but was capable of performing the requirements of representative occupations "such as entry-level clerical, materials, recording, and scheduling jobs," including stock and inventory quality control clerk, DOT 229.587-018, credit card clerk, DOT 210.382-038, document preparer, DOT 249.587-018, and lab clerk, DOT 222.587-026.  (AR 26.)  The ALJ concluded that Plaintiff was not disabled, as defined in the Social Security Act, from January 1, 2009, the alleged onset date, through the date of the decision.  (AR 26.)  Plaintiff appealed the ALJ's decision on February 11, 2013 (AR 11-13), and the appeal was denied on June 20, 2014 (AR 5-10), making the ALJ's decision final.

**E.      Plaintiff's Complaint**

On August 16, 2014, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision.  (Doc. 1.)  Plaintiff argues the ALJ improperly weighed the conflicting medical opinions of the psychological consultative examiner and the state agency reviewing psychiatrist, improperly evaluated the limiting effects of Plaintiff's impairments, and improperly rejected Plaintiff's testimony.  (Docs. 13; 15.)

### III.   SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error."  *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance."  *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  The Court "must consider the entire record as a whole, weighing both

1   the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and

2   may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v.*

3   *Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

4                                    **IV.   APPLICABLE LAW**

5          An individual is considered disabled for purposes of disability benefits if he is unable to

6   engage in any substantial, gainful activity by reason of any medically determinable physical or

7   mental impairment that can be expected to result in death or that has lasted, or can be expected to

8   last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A),

9   1382c(a)(3) (A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or

10  impairments must result from anatomical, physiological, or psychological abnormalities that are

11  demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

12  such severity that the claimant is not only unable to do his previous work, but cannot, considering

13  his age, education, and work experience, engage in any other kind of substantial, gainful work that

14  exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

15         The regulations provide that the ALJ must undertake a specific five-step sequential

16  analysis in the process of evaluating a disability.   In Step 1, the ALJ must determine whether the

17  claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b),

18  416.920(b).   If not, the ALJ must determine at Step 2 whether the claimant has a severe

19  impairment or a combination of impairments significantly limiting her from performing basic

20  work activities.   *Id.* §§ 404.1520(c), 416.920(c).   If so, the ALJ moves to Step 3 and determines

21  whether the claimant has a severe impairment or combination of impairments that meet or equal

22  the requirements of the Listing of Impairments ("Listing"), 20 § 404, Subpart P, App. 1, and is

23  therefore presumptively disabled.   *Id.* §§ 404.1520(d), 416.920(d).   If not, at Step 4 the ALJ must

24  determine whether the claimant has sufficient RFC despite the impairment or various limitations

25  to perform her past work.   *Id.* §§ 404.1520(f), 416.920(f).   If not, at Step 5, the burden shifts to the

26  Commissioner to show that the claimant can perform other work that exists in significant numbers

27  in the national economy.   *Id.* §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or

28  not disabled at any step in the sequence, there is no need to consider subsequent steps.   *Tackett v.*

1   *Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

2   **V.   DISCUSSION**

3   **A.      The ALJ's Evaluation of Plaintiff's Functional Limitations**

4   **1.      The ALJ's Consideration of Dr. Valos' Medical Opinion**

5   Plaintiff contends the ALJ erred in his assessment of psychological consultative examiner

6   Dr. Valos and state agency reviewing psychiatrist Dr. Law.  (Docs. 13, pp. 7-10; 15, pp. 1-3.)

7   Plaintiff contends the ALJ failed to recognize that the physicians' opinions conflicted, in that Dr.

8   Valos had opined to more restrictive limitations on Plaintiff's ability to interact with coworkers

9   and supervisors or tolerate changes in routine.  (Doc. 13, p. 8.)  The Commissioner responds that

10  substantial evidence supports the ALJ's evaluation of both the medical opinion evidence and the

11  limitations imposed by Plaintiff's mental impairments.  (Doc. 14, pp. 8-10.)

12  The ALJ noted Plaintiff told Dr. Valos "she could not work because she cannot deal with

13  people and may snap at them," and Dr. Valos "opined that [Plaintiff]'s psychiatric symptoms may

14  interfere with relationships with coworkers, supervisors, and the public in a work-like situation

15  and cause difficulty in tolerating the stresses, pressures, and changes in routine usually associated

16  with day-to-day work activities."   (AR 21; 24.)   The ALJ also noted that during Dr. Valos'

17  evaluation, Plaintiff

18
19      . . . demonstrated anxious mood, blunted affect, pressured speech, poor eye
        contact, increased psychomotor activity, exaggerated startle response,
        disorganized thought process, obsessions, below-average attention and
20      concentration, mildly impaired memory, and low-average fund of information.

21  (AR 22.)  The ALJ noted, however, that

22      . . . [t]hese exacerbated symptoms[ ] [ ] correlated directly with life stressors,
        including the death of her husband and family members, as well as the loss of her
23      business, home, and vehicles, following her husband's passing [citations omitted].

24      Otherwise, even when taking no medications, [Plaintiff] largely denied
        psychiatric symptoms and had a bright affect, ethymic mood, appropriate
        judgment, good insight, intact recent and remote memory, and generally normal
25      mental status evaluation (*sic*) [citations omitted].

26  (AR 22.)

27  The ALJ found Dr. Valos' opinion to be consistent with reviewing state agency psychiatric

28  consultant Dr. Law's opinion that Plaintiff "has moderate restriction of daily living, difficulties in

maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace," "moderate limitations in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; and interacting appropriately with the general public." (AR 24.) The ALJ afforded significant weight to these opinions because

> . . . Dr. Valos' and [Dr. Law's] opinions are generally consistent with the record as a whole, which documents generally unremarkable mental status evaluations but periods of exacerbated symptoms and decreased concentration coinciding with life stressors.

(AR 24.)

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Generally, an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion. *Id.* Where a treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record. *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). The ALJ can meet this burden by setting forth a detailed and thorough summary of the facts and conflicting clinical evidence, stating her interpretation thereof, and making findings. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). Factors relevant to evaluating medical opinions include the amount of relevant evidence that supports the opinion and the quality of the explanation provided and the consistency of the medical opinion with the record as a whole. *See Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 404.1527(d)(3)-(6)).

Plaintiff contends that because Dr. Law's opinion rejected Dr. Valos' more restrictive opinion on Plaintiff's ability to interact with coworkers and supervisors and to tolerate stresses and changes in routine, the ALJ implicitly rejected that portion of Dr. Valos' opinion without explanation. (Doc. 13, p. 9.) The ALJ, however, explained her reasons for discounting Dr. Valos' postulation that Plaintiff "may" encounter difficulties interacting with coworkers and supervisors

1    and tolerating changes in stresses and routine.  The ALJ accorded great weight to Dr. Valos'

2    opinion to the extent it was consistent with the record as a whole, "which documents generally

3    unremarkable mental status evaluations but periods of exacerbated symptoms and decreased

4    concentration coinciding with life stressors."  (AR 24.)  The ALJ weighted Dr. Valos' opinion as

5    being "generally consistent" with the record, but specifically excepted those "periods of

6    exacerbated symptoms and decreased concentration coinciding with life stressors" from the

7    credited opinion evidence.  (AR 24.)

8         Dr. Valos' statements that Plaintiff's "psychiatric symptoms *may* interfere with

9    relationships with coworkers, supervisors and the public . . . and cause difficulty in tolerating the

10   stresses, pressures, and changes in routine usually associated with day-to-day work activities"

11   (AR 24 (italics added)) are not opinions about Plaintiff's *current* functional limitations.  Dr. Valos

12   unambiguously opined that Plaintiff "is unable to carry out complex tasks, which require focused

13   attention, concentration, and memory skills" and that while her "attention, memory, abstraction,

14   and cognitive flexibility skills are impaired, she "is able to understand and follow various

15   direction."  (AR 265-66.)  Had Dr. Valos intended to impose additional functional limitations in

16   the areas of relationships and stress, he would have done so as unequivocally and unambiguously

17   as he did with Plaintiff's actual limitations in the areas of attention and memory.  (*See id.*)

18        Interpreting Dr. Valos' opinion as containing concrete, unequivocal limitations would be

19   inconsistent with Dr. Valos' own findings on examination, Plaintiff's testimony, and the record as

20   a whole.  Dr. Valos observed Plaintiff to be "'congenial and engaging'" and "'very talkative,'"

21   "consistent with no more than mild difficulties in maintaining social functioning."  (AR 23.)

22   Plaintiff "reported she has no problems following instructions or getting along with authority

23   figures" and "speaks with friends daily and gets along with her family."  (AR 23.)  Aside from her

24   "exacerbated symptoms" which were correlated directly with life stressors" like the loss of

25   Plaintiff's husband, home, business, vehicles, and other family members, "even when taking no

26   medications, [Plaintiff] denied psychiatric symptoms and had a bright affect, euthymic mood,

27   appropriate judgment, good insight, intact recent and remote memory, and generally normal

28   mental status evaluation[s]."  (AR 22; *see also* AR 262-66; 646 (noting Plaintiff was not

compliant with medications); 648-50 (noting Plaintiff's symptoms arose from the loss of her husband, that she "has not sought proper treatment," and explaining that Plaintiff's "pressured speech" arises from her hearing deficits and that while Plaintiff exhibits "aggressive behavior" she does not exhibit "social withdrawal," ), 654-56 (noting Plaintiff's "current impairment is moderate, as she is under a great deal of strain; however, she has skills, is bright, and has a lot of strengths" and Plaintiff "appears to be completely overwhelmed with life stressors at this time, including her medical issues (deafness, hepatitis) and difficulty accessing her medical care, legal issues"); 666, 669, 676, 694, 695 (noting Plaintiff was not taking any medication and observing appropriate judgment, good insight, euthymic mood, and appropriate affection); 673, 675, 678, 691, 692, 708, 767 (Plaintiff taking no medications); 726 (denying depressed mood or depression).)  The evidence reasonably supports the ALJ's RFC assessment, and any error in not including Dr. Valos' equivocal functional limitations was harmless.  *See Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (holding that an ALJ's error is harmless so long as substantial evidence supports the ultimate conclusion).

That Plaintiff "may" encounter difficulties in some areas does not imply she was precluded or limited in those areas, particularly as reviewing psychiatrist Dr. Law did not adopt those equivocal portions of Plaintiff's report and Plaintiff's own testimony does not support such limitations.  The ALJ was not required to articulate specific and legitimate reasons to reject portions of Dr. Valos' opinion that were ambiguous or equivocal.  *See* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *see also Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) ("[w]e will not reverse credibility determinations of an ALJ based on contradictory or ambiguous evidence"); *Tommasetti*, 533 F.3d at 1041 ("the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence"); *Andrews v, Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995) ("[t]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities").  The ALJ was also not required to accept and incorporate into her RFC assessment every potential functional limitation, only those for which substantial evidence existed in the record.  *Rounds v. Comm'r of Soc. Sec.*, 807 F.3d. 996, 1006 (9th Cir. 2015) (citing *Carmickle*, 533 F.3d at 1165) ("An ALJ may rationally rely on specific imperatives regarding a

1   claimant's limitations, rather than recommendations"); *Stubbs-Danielson v. Astrue*, 539 F.3d

2   1169, 1174 (9th Cir. 2008) (an ALJ may translate mental limitations into "the only concrete

3   restrictions available to h[er]").

4         Even assuming there was evidence in the record to support Dr. Valos' equivocal

5   limitations on Plaintiff's relationships with coworkers and supervisors or ability to tolerate

6   changes in routine, any error was harmless because substantial evidence supports the ALJ's

7   ultimate RFC determination.  *See Carmickle*, 533 F.3d at 1162.  The ALJ limited Plaintiff to "no

8   more than superficial public interaction and simple repetitive tasks."  (AR 21.)   Contrary to

9   Plaintiff's contention, a limitation to simple, repetitive tasks is a reasonable limitation

10  encompassing both Drs. Law and Valos' concrete limitations on Plaintiff's ability to work with the

11  general public and deal with simple tasks, and Dr. Valos' concern that Plaintiff may encounter

12  difficulties in interacting with others in the workplace and in tolerating changes in routine.

13  Plaintiff's reliance on *Ramirez v. Barnhart*, 372 F.3d 546 (3d Cir. 2004), is unpersuasive.  In that

14  case, the Third Circuit found the ALJ erred by ignoring medical testimony explicitly identifying

15  accommodation of a severe anxiety-related pace deficiency as a significant precondition for the

16  plaintiff's success in maintaining a full-time job.  *See id.*, 372 F.3d at 555.  The medical testimony

17  in this case, however, does not endorse a particularized accommodation like the one identified in

18  *Ramirez.*   No medical testimony unequivocally identified a functional limitation on Plaintiff's

19  ability to interact with coworkers or supervisors or her ability to tolerate changes in the work

20  routine.   As mentioned above, the only concrete functional limitations in this case were those

21  specifically endorsed by Drs. Valos and Law: that Plaintiff "can carry out various simple tasks and

22  understand and follow various directions" and that Plaintiff has the "capacity for simple repetitive

23  tasks but moderate limitations in understanding, remembering, and carrying out detailed

24  instructions; maintaining attention and concentration for extended periods; and interacting

25  appropriately with the general public[.]"  (AR 24; *see* AR 265-66; 277-94.)  *Stubbs-Danielson*,

26  539 F.3d at 1174-75.

27         It is unclear what additional limitation Plaintiff believes the ALJ should have included in

28  her RFC assessment to address Plaintiff's potential and unquantified difficulties in handling stress

1   and interacting with coworkers or supervisors.  It is reasonable to expect that jobs that are simple,

2   routine, and repetitive and require "no more than superficial public interaction" are more likely to

3   be the type of work that would reasonably accommodate someone who occasionally suffered

4   psychological symptoms, because such work does not include complex variables, changing

5   expectations, or require difficult decision-making.   In other words, work in a high-stress

6   environment involving many details and variables and requiring ongoing decision-making may be

7   more difficult to attempt when experiencing psychological symptoms, increasing absences.   A

8   simple, repetitive job with limited interaction with the public would reasonably address any stress

9   limitations.

10         In sum, Dr. Valos' opinion was properly considered, and the ALJ did not err in failing to

11   include a limitation on Plaintiff's interaction with coworkers and supervisors or tolerance of

12   changes in routine associated with day-to-day work activities in her RFC assessment.

13         **2.      The ALJ's RFC Assessment**

14         Plaintiff next argues the ALJ "erroneously ruled [P]laintiff had normal mental status exams

15   and that in August 2012 'treating records note no psychotropic medications or therapy prescribed,

16   suggesting [Plaintiff] did not require further mental health treatment[.]'"  (Doc. 13, p. 10 (quoting

17   AR 22-23.)  Plaintiff contends that the ALJ's conclusion "is contrary to Dr. Goklaney's treatment

18   records and medication prescriptions."  (Doc. 13, p. 10.)  By failing to include Dr. Goklaney's

19   prescriptions for psychotropic medication in January and March of 2012, Plaintiff concludes, the

20   ALJ failed to incorporate the full extent of functional limitations imposed by Plaintiff's mental

21   impairments into her RFC assessment.   (Docs. 13, pp. 10-11; 15, p. 2.)   The Commissioner

22   contends the ALJ fully captured all of Plaintiff's functional limitations in her RFC assessment and

23   that her RFC assessment is supported by the medical evidence and Plaintiff's testimony.  (Doc. 14,

24   pp. 10-12.)

25         The RFC is an assessment of an individual's ability to do sustained work-related physical

26   and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5

27

28

days a week, or an equivalent work schedule. Social Security Ruling ("SSR")[2] 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). The ALJ "is responsible for translating and incorporating clinical findings into a succinct RFC." *Rounds*, 807 F.3d. at 1006).

Plaintiff contends that Dr. Goklaney's treating records somehow contradict the ALJ's RFC assessment. Plaintiff notes the ALJ pointed to her treatment in August of 2012 to "suggest[ ] [Plaintiff] did not require further mental health treatment" despite that in January 2012 Dr. Goklaney "Remeron, an anti-depressant[,] and Tegretol, which is used to treat bipolar disorder" and in March 2012 Dr. Goklaney continued Plaintiff on Remeron and replaced Tegretol with "Seroquel, which is an anxiety medication used to treat schizophrenia and bipolar disorder" and added Buspar, an anti-anxiety medication, in December 2012. (Doc. 13, pp. 10-11 (citing AR 22-23; 648-50; 790-91).) The mere fact that Plaintiff was prescribed psychotropic medications does not demonstrate the existence of a *functional limitation* on Plaintiff's ability to work. Indeed, the fact that there is no indication Plaintiff remained on her psychotropic medications during that period of time or received any mental health counseling sufficiently suggests that Plaintiff's symptoms may not have been as serious as she has alleged. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). Though Plaintiff alleges she "has longitudinal mental health treatment that was missed or ignored by the ALJ[,]" Plaintiff does not identify exactly what that treatment history is or where those additional records might be. (*See* Docs. 13; 15.)

Contrary to Plaintiff's contention, the ALJ nowhere dismissed Plaintiff's claim of long-standing anxiety, nor did the ALJ deny that Plaintiff had indeed sought some psychological

---

[2] Social Security Rulings ("SSR") are final opinions and statements of policy by the Commissioner of Social Security, binding on all components of the Social Security Administration. 20 C.F.R. § 422.406(b)(1). They are "to be relied upon as precedent in determining cases where the facts are basically the same." *Paulson v. Bowen*, 836 F.2d 1249, 1252 n.2 (9th Cir.1988).

1    treatment and psychotropic medications at times.  (*See* AR 21-25.)  Rather, the ALJ recognized

2    Plaintiff's history of psychiatric symptoms, but declined to endorse the full alleged severity of

3    those symptoms when "exacerbated" by a series of tragic, triggering events, "including the deaths

4    of her husband and family members, as well as loss of her business, home, and vehicles, following

5    her husband's passing[.]"  (AR 22.)  The ALJ pointed out that while Plaintiff had experienced

6    significant upswells in her subjective symptoms as a result of these losses, she otherwise displayed

7    largely "normal" symptoms, even when unmedicated.  (AR 22.)  Plaintiff repeatedly admitted she

8    was not taking any medication (*see* AR 341; 348-50; 352; 354; 663; 666; 669; 673; 675; 676; 678;

9    691; 692; 694; 695; 708; 767), and yet displayed appropriate judgment, good insight, euthymic

10   mood, and appropriate effect (*see* AR 338; 341; 348; 350; 352; 354) and intact recent and remote

11   memory on evaluation (*see* AR 341; 350).

12          Though Plaintiff argues the ALJ only focused on medical evidence from when Plaintiff

13   "was doing well, while ignoring and denying the existence of medical evidence that showed

14   severe symptoms" (Doc. 15, p. 3), the record as a whole demonstrates otherwise.  The medical

15   opinion evidence supported the ALJ's RFC assessment that Plaintiff could – within the auspices of

16   simple, repetitive work – sustain adequate concentration, persistence, and pace to complete a

17   normal workday and workweek, could interact appropriately with coworkers and supervisors, and

18   could respond appropriately to changes in the work setting.  (*See* AR 288 (state agency

19   psychological consultant Dr. Law); 265-66 (consultative examiner Dr. Valos, opining only to a

20   concrete limitation on Plaintiff's ability to carry out simple tasks and understand and follow

21   directions).)  Plaintiff's own testimony that she could perform many activities such as preparing

22   meals, doing household chores, taking care of her dogs, taking care of her personal care, driving

23   independently, and managing money (*see* AR 23; 195-99) also support the ALJ's RFC assessment.

24   Moreover, Plaintiff's testimony that she "has no problems following instructions or getting along

25   with authority figures," visits with friends several times a week, and "speaks with friends daily

26   and gets along with her family" (*see* AR 23; 199-200) further support the ALJ's assessment that

27   Plaintiff is capable of working without a limitation on her ability to work with coworkers or

28   supervisors.  *See, e.g., Fair*, 885 F.2d at 604.

1    Plaintiff contends that her history of treatment for anxiety since 2008 demonstrates that her

2  anxiety must be disabling.  (Doc. 13, p. 11.)  The ALJ, however, specifically explained the

3  worsening of her mental symptoms was directly caused by specific triggering "life events" and

4  therefore explicitly relied on "the entire record as a whole" to determine her RFC rather than

5  "isolating a specific quantum of supporting evidence" to conclude that Plaintiff's exacerbated

6  symptoms would be permanent.  *See Orn*, 495 F.3d at 630.  As discussed above, the *overall*

7  medical record supports the ALJ's determination that Plaintiff experienced "exaggerated

8  symptoms" as a direct result of significant "life stressors, including the deaths of her husband and

9  family members, as well as loss of her business, home, and vehicles, following her husband's

10  passing" and conclusion that otherwise, even when unmedicated, Plaintiff's symptoms did not

11  impose any further functional limitations.  (AR 22.)

12    Accordingly, based on the medical evidence and Plaintiff's own statements, the ALJ's

13  assessment that Plaintiff retained the RFC to perform simple, repetitive tasks with no more than

14  superficial public interaction (AR 21) was supported by substantial evidence in the record.

15  **B.**    **The ALJ's Evaluation of Plaintiff's Testimony**

16    Plaintiff contends the ALJ failed to articulate clear and convincing reasons for discounting

17  her statements regarding the severity and extent of her ongoing symptoms.  (Docs. 13, pp. 11-12;

18  15, p. 3.)  The Commissioner asserts the ALJ properly evaluated Plaintiff's subjective complaints.

19  (Doc. 14, pp. 11-15.)

20    In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ

21  must engage in a two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009); *Bunnell*

22  *v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc).  First, the ALJ must determine whether

23  the claimant has presented objective medical evidence of an underlying impairment that could

24  reasonably be expected to produce the pain or other symptoms alleged.  *Vasquez*, 572 F.3d at 591.

25  The claimant is not required to show that her impairment "could reasonably be expected to cause

26  the severity of the symptom [she] has alleged; she need only show that it could reasonably have

27  caused some degree of the symptom."  *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the

28  claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the

1  claimant's testimony about the severity of the symptoms if she gives "specific, clear and

2  convincing reasons" for the rejection.  *Id.*

3       The ALJ also may consider (1) the claimant's reputation for truthfulness, prior inconsistent

4  statements, or other inconsistent testimony, (2) unexplained or inadequately explained failure to

5  seek treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities.

6  *Tommasetti*, 533 F.3d at 1041; *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-

7  27 (9th Cir. 2009); *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); 20 C.F.R. §§ 404.1529,

8  416.929.  "If the ALJ's finding is supported by substantial evidence, the court may not engage in

9  second-guessing."  *Tommasetti*, 533 F.3d at 1039.

10       Plaintiff asserts the ALJ improperly discounted her credibility as being inconsistent with

11  the objective medical evidence and Plaintiff's admitted activities of daily living.  (Doc. 13, p. 12

12  (citing AR 22-23).)  Plaintiff contends the ALJ failed to account for two abnormal mental status

13  exams by treating physician Dr. Goklaney and his prescription of psychotropic medications (*See*

14  Doc. 13, p. 12 (citing AR 648-50; 790-91).)  As discussed above, the mere fact that Plaintiff was

15  twice prescribed psychotropic medications in January and March of 2012 does not demonstrate the

16  existence of a functional limitation on Plaintiff's ability to work.  Rather, the fact there is no

17  indication Plaintiff remained on her psychotropic medications during that period of time, as

18  demonstrated by Dr. Henein's August 2012 note that Plaintiff was not taking any medications, or

19  received any mental health counseling, suggests that Plaintiff's symptoms may not have been as

20  serious as she has alleged.  *See Fair*, 885 F.2d at 603.  As such, the ALJ permissibly relied on the

21  overall medical record and Plaintiff's lack of treatment and medication to discredit Plaintiff's

22  testimony as to the extent of the limitations imposed by her mental impairment.  *See Tommasetti*,

23  533 F.3d at 1041.

24       Plaintiff next asserts the ALJ's recitation of her daily activities "are not specific, clear, or

25  convincing reasons" for disbelieving her testimony.  (Doc. 13, p. 12.)  While the mere fact that a

26  claimant engages in certain daily activities does not necessarily detract from her credibility as to

27  overall disability, daily activities support an adverse credibility finding if a claimant is able to

28  spend a substantial part of her day engaged in pursuits involving the performance of physical

functions or skills that are transferable to a work setting.  *Orn*, 495 F.3d at 639; *see also Thomas*, 278 F.3d at 959.  A claimant's performance of chores such as preparing meals, cleaning house, doing laundry, shopping, occasional childcare, and interacting with others has been considered sufficient evidence to support an adverse credibility finding when performed for a substantial portion of the day.  *See Stubbs-Danielson*, 539 F.3d at 1175; *Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005); *Thomas*, 278 F.3d at 959.  "Even where those activities suggest some difficulty functioning, they may be grounds for discrediting [Plaintiff]'s testimony to the extent that they contradict claims of a totally debilitating impairment."  *Molina v. Astrue,* 674 F.3d 1104, 1113 (9th Cir. 2012) (internal citations omitted).  Contrary to Plaintiff's assertion, here, the ALJ permissibly relied on Plaintiff's admitted and demonstrated daily activities as being inconsistent with her "subjective symptoms and difficulties":

> . . . despite [Plaintiff]'s subjective symptoms and difficulties, she lives alone and did not report any particular help in maintaining her residence.  She admitted she is able to perform independent personal care without problems, care for pet dogs, do all household chores, prepare full meals, watch the news and television with the volume turned up, drive independently, grocery shop regularly, and manage money.  She presented [at doctors' appointments] with good hygiene and grooming, confirming [her] capacity for self-care.  [Plaintiff]'s friend reported that [Plaintiff] was capable of spending time with friends multiple times a week, and [Plaintiff] reported she speaks with friends daily and gets along with her family.  Further, she presented as "congenial and engaging" and was "very talkative" at a consultative examiner interview, consistent with no more than mild difficulties in maintaining social functioning.  This relatively intact range of daily activities is consistent with the residual functional capacity.

(AR 23 (internal citations omitted).)

Contrary to Plaintiff's contention, these are specific, clear, and convincing reasons for discounting Plaintiff's credibility.  (Doc. 13, p. 12.)  This is not a case where the plaintiff testified that she was completely dependent for her activities of daily living.  Plaintiff cared for her personal needs, prepared meals, did household chores, took care of her pet dogs, drove by herself, shopped in stores, watched television, and socialized with family and friends (AR 175-82; 220-29) – these types of activities tend to suggest Plaintiff is still be capable of performing the basic demands of unskilled work on a sustained basis.  *See, e.g., Stubbs-Danielson*, 539 F.3d at 1175 (the ALJ sufficiently explained his reasons for discrediting the claimant's testimony because the

record reflected that the claimant performed normal activities of daily living, including cooking, housecleaning, doing laundry, and helping her husband in managing finances – all of which "tend[ed] to suggest that the claimant may still be capable of performing the basic demands of competitive, remunerative, unskilled work on a sustained basis.").

Even to the extent that Plaintiff's testimony was "somewhat equivocal about how regularly she was able to keep up with all of these activities, and the ALJ's interpretation of her testimony may not be the only reasonable one[. . . .] it is still a reasonable interpretation and is supported by substantial evidence; thus, it is not our role to second-guess it." *Id.* (citing *Fair*, 885 F.2d at 604); *see also Thomas*, 278 F.3d at 954 (where "evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld[,]"); *Andrews*, 53 F.3d at 1041.  (*See, e.g.,* AR 65 (testifying at the hearing that her symptoms are severe "to the point where I have days I can't even get up or I don't want to deal with anything").)  Just because there is more than one way to reasonably interpret the evidence in the record does not mean that the ALJ committed reversible error.  *See, e.g., Sprague*, 812 F.2d at 1229-30.

In sum, the ALJ's reasons were properly supported by the record and sufficiently specific to allow the Court to conclude that the ALJ rejected the Plaintiff's testimony on permissible grounds, and did not arbitrarily discredit Plaintiff's testimony.

## VI.   RECOMMENDATION

Based on the foregoing, the Court finds that the Commissioner's decision was supported by substantial evidence within the record.   Accordingly, the Court RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of Social Security be DENIED and that JUDGMENT be entered in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security and against Plaintiff Lori Ann Brown.

These findings and recommendations are submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within fourteen (14) days of service of this recommendation, any party may file written objections to these findings and recommendations with the Court and serve a copy on all parties.  The document

should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C).   The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   **January 29, 2016**                            **/s/ Sheila K. Oberto**
                                                                UNITED STATES MAGISTRATE JUDGE